IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN W. GRIFFITHS, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 15-cv-13022-NMG |
| v. | ) ) | |
| AVIVA LONDON ASSIGNMENT CORPORATION, AVIVA LIFE INSURANCE COMPANY, AVIVA INTERNATIONAL INSURANCE LTD, f/k/a CGU INTERNATIONAL INSURANCE, plc, ATHENE HOLDING, LTD, ATHENE LONDON ASSIGNMENT CORPORATION and ATHENE ANNUITY AND LIFE COMPANY, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**PLAINTIFF'S OPPOSITION TO
THE MOTION OF DEFENDANT AVIVA INTERNATIONAL
INSURANCE LIMITED (FORMERLY CGU INTERNATIONAL INSURANCE, PLC)
TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

The Motion to Dismiss of Aviva International Insurance Limited, formerly CGU International Insurance, PLC (hereinafter "CGU") fails because it makes no serious attempt to come to terms with the facts actually pled, or the theory of liability stated in Plaintiff's Amended Complaint, or with the commercial realities of what happened here. This failure is all the more striking because the most important of these facts are not even in dispute, because CGU, in its motion papers, has admitted them – not *arguendo,* for purposes of this Motion, but definitively.

## FACTS

The annuities at issue in this case were sold "on the basis of" CGU's "unique guarantee" Amended Complaint ¶2 -- the written promise *by CGU* "that Defendant CGU would stand behind the Guaranteed Annuities and ensure that all payments called for by the Guaranteed Annuities would be made and made timely." [*See* Doc. No. 28, ¶2].

Thus, the Complaint alleges that "AVIVA" – which includes CGU – promised "to the purchasers of the Guaranteed Annuities * * * that Defendant CGU would guarantee all payments to be made on all of the Guaranteed Annuities. This promise [was made] directly to the Plaintiffs, [and] Plaintiffs relied [on this promise] when they purchased the Guaranteed Annuities."  ¶8.

The AVIVA document appended to the Amended Complaint [Doc. No. 28-1, p. 16] tells prospective annuity purchasers that the agreement entered into by CGU

> guarantees that AVIVA London Assignment Corporation will have the funds necessary to satisfy all Structured Settlement obligations assigned to it, regardless of the financial position regardless of the financial position of the life company through which the "assigned" annuities are purchased.  This obligation is absolute, unconditional and continuing.

There is no dispute that CGU entered into this agreement with AVIVA London Assignment Corporation ("ALAC"), as that fact has been admitted – not just for purposes of this Motion, but absolutely – in the Cooper Declaration appended as an Exhibit to CGU's brief.  [*See* Doc. No. 31,  ¶5].

CGU's papers say nothing about why CGU and ALAC signed this agreement.  But CGU makes no effort to deny, or in any way to confront, to explain away, or even to diminish the force of, the Amended Complaint's allegation, in ¶39, that

> The CMA Guarantee was issued by Defendant CGU with the express purpose and effect of increasing the value of annuities sold within Massachusetts and throughout the United

States, including the Griffiths Annuity and all annuities issued for the benefit of all members of the proposed class in this case. On information and belief, the sole purpose of the CMA was to affect the strength, and thereby the price, of annuities issued by Defendants in the United States, including in Massachusetts.

Because all of the annuities were sold by ALAC, and ALAC was based in Massachusetts, all of the annuities at issue in this case – the entire book of business with which this case is concerned – were sold in this District on the basis of, and with the support of, CGU's promise.  And, the Complaint alleges, ALAC was able to command the prices it obtained solely because of the CGU guarantee.  CGU has not quarreled with that allegation in any way in its papers, or attempted to show that they don't affect the determination on personal jurisdiction.  Instead, CGU has simply ignored all of these facts.

While CGU is silent about the impact of its guarantee on the price of ALAC's annuities, the Answer filed by the remaining defendants is not.  In that pleading [Doc. No. 32], the remaining AVIVA defendants essentially acknowledge that the CGU guarantee did exactly what the AVIVA document cited above says it will do—give annuity purchasers such as Plaintiff an incremental degree of protection against default by ALAC.  Thus, in the Affirmative Defenses section of their Answer, ¶2, these defendants plead:

> Upon its termination, the CMA was replaced with other capital maintenance and reinsurance agreements that provide Plaintiff and all members of the proposed class with protection against default that are not materially weaker than the protection offered by the CMA.

In this allegation, the remaining AVIVA defendants have formally admitted that the CMA "offered protection" to "Plaintiff and all members of the proposed class."  Because all of the annuities here at issue were sold out of Massachusetts by Massachusetts-based ALAC, that protection is an impact on this District which the Court must include in its analysis of CGU's jurisdictional argument.

Most importantly, the Cooper declaration [Doc. No. 31] does not say anything about the essential, substantial and ongoing obligations and actions CGU commits to perform, with respect to a Massachusetts-headquartered company, under the agreement.  In particular, as shown by the letter to Mr. Griffiths from ALAC's Jeff Whitehead, Senior Vice President and Chief Financial Officer, attached Exhibit A to the Cooper Declaration [Doc. No. 31-1], CGU's obligation under the CMA was

> to maintain sufficient capital in [Massachusetts-headquartered] Aviva London Assignment to ensure that it has the necessary funds available to satisfy all structured settlement agreement obligations assigned to it and assumed by Aviva London Assignment during the term of the Agreement.

Whitehead's letter assured that CGU's "obligation" was "unconditional" and "continuing."  *Ibid.*

This is no one-time payment.  Rather, it is a "continuing" duty to be apprised of the magnitude of the obligations taken on by Aviva London Assignment; to check continually to ensure that ALAC has sufficient capital, given both the magnitude of ALAC's obligations and ALAC's own financial performance, and, at any time or times when such a payment is needed, to pay the amounts due throughout the term of all of the obligations assigned to ALAC during the term of the Agreement.   For this reason, the AVIVA marketing document appended to the Amended Complaint itself says that CGU's guarantee assures that enough money will be available to make the promised payments "regardless of the financial position of" ALAC. Indeed, the fact that this is a "continuing" obligation, and not a one-off transaction, is itself made explicit by the Whitehead letter, which states that CGU's obligation under the CMA is "unconditional" and "continuing."  [Doc. No. 31-1]  That promise thus creates an unconditional and continuing relationship with respect to a Massachusetts-headquartered company, because the magnitude of CGU's duty, to pay money into Massachusetts-based ALAC, is determined by the ongoing financial performance of that Massachusetts entity and by the magnitude of thousands

of annuities issued in Massachusetts.

## ARGUMENT

The facts conceded, or left undisputed, by CGU establish that this Court has specific

jurisdiction over CGU with respect to the claims at issue in this case.  That is so because, by

signing the CMA, CGU "has purposefully directed [its] activities at residents of the forum, and

the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger*

*King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73 (1984).  Several different facts show this to be

true, and each of those facts is relied upon by the controlling authorities as the basis for finding

that a court has personal jurisdiction over a foreign defendant who acted as CGU has acted in

this case.[1]

The basic framework for the inquiry was set out in *Optos, Inc. v. Topcon Med. Sys.*, 777

F. Supp. 2d 217, 227 (D.Mass. 2011):

> In determining whether a non-resident defendant is subject to its jurisdiction, a federal
> court exercising diversity jurisdiction is the functional equivalent of a state court sitting
> in the forum state." *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290
> F.3d 42, 51 (1st Cir. 2002) (quotations and citations omitted). Accordingly, this Court
> may only exercise personal jurisdiction within the limits set by Massachusetts' long-arm
> statute and the Constitution. *Lyle Richards Int'l, Ltd. v. Ashworth, Inc.*, 132 F.3d 111, 112
> (1st Cir. 1997). Here, the Court "may sidestep the statutory inquiry and proceed directly
> to the constitutional analysis . . . because the Supreme Judicial Court of Massachusetts
> has interpreted the state's long-arm statute 'as an assertion of jurisdiction over the person
> to the limits allowed by the Constitution of the United States.'" *Daynard*, 290 F.3d at

---

[1] The law is clear that

> [i]n determining whether a defendant has "purposefully availed" itself of the privilege of
> conducting activity in the forum state, a court is to focus on the nature of the contact with
> the forum and avoid playing a "numbers game" -- a single, meaningful contact with the
> forum, even by means of a virtual presence, "can fill the bill." *Pritzker*, 42 F.3d at
> 61 (citing *McGee v. International Life Ins. Co.* 355 U.S. 220, 2 L. Ed. 2d 223, 78 S. Ct.
> 199 (1957), for the proposition that a contractual relationship may be sufficient to confer
> jurisdiction even where the defendant does not physically enter the forum).

*Lawson v. Affirmative Equities Co., L.P.*, 341 F. Supp. 2d 51 (D. Mass. 2004).

52 (quoting "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 443, 280 N.E.2d 423 (1972)).

On the Constitutional question, the First Circuit "divides its Due Process minimum contacts analysis into three inquiries: relatedness, purposeful availment, and reasonableness. *See Daynard*, 290 F.3d at 60.   *Northern Laminates v. Davis,* 403 F.3d 14, 25 (1st Cir. 2005).

### 1.   The Relatedness Requirement Is Met Here

To satisfy the relatedness requirement, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *United Elec. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1089 (1st Cir. 1992).  This test is a "flexible, relaxed standard,"  *Pritzker v. Yari,* 42 F.3d 53, 61 (1st Cir. 1994), and it is clearly met here:  Plaintiff's claims are focused entirely on the CMA, which is the forum-directed activity said to provide the basis for this Court's assertion of personal jurisdiction.  As *Northern Laminates*, and the authorities it cites, make clear, in assessing the relatedness requirement a "defendant need not be physically present in the forum state to cause injury (and thus "activity" for jurisdictional purposes) in the forum state. *See, e.g.*, *Calder v. Jones,* 465 U.S. 783, 789 (1984) (finding jurisdiction over petitioners proper in California based on the "effects" of their Florida conduct in California)."  403 F.3d at 25.

### 2.   CGU Has Purposefully Availed Itself Of the Privilege of Conducting Activities in Massachusetts

The purposeful availment requires that the Defendant engage in activities that "mak[e] the defendant's involuntary presence before the state's courts foreseeable." *United Elec. Workers,* 960 F.2d at 1089. The focus in this second requirement is on "voluntariness and foreseeability." Before reaching the law, we can begin by simply invoking common sense:  CGU's action was precisely to afford a "guarantee" for annuities sold in Massachusetts, and the whole point of a

guarantee is that one can be called to account to make good on it.  That's a what a guarantee is. If it cannot be enforced when needed, the guarantee is worthless, and really is not a guarantee at all.

Common sense also directs our attention to the "continuous" activity CGU committed to engage in pursuant to the terms of its commitment in the CMA.  As explained in the AVIVA document [Doc. No. 28-1, p. 16], CGU agreed to guarantee the ability to make good on its obligations of the AVIVA entity issuing the annuity here at issue "regardless of the financial position of the life company" nominally responsible for making the payments.  This requires continuous awareness of both the financial position of that entity and the extent of its financial obligations to its annuity customers, and it means that at any time CGU could be called upon to contribute capital to that Massachusetts-based life company.

Because CGU took on an "unconditional" and "continuous" obligation to contribute capital to a Massachusetts-based company at any time that such a contribution was necessary, it was clearly foreseeable that such a demand would be made in a legal proceeding in Massachusetts. Indeed, in *Wolverine, Proctor & Schwartz, Inc. v. Aeroglide Corp.,* 394 F.Supp.2d 299, 310 (D. Mass. 2005)(internal citations omitted), Magistrate Judge Dein noted that "the enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state." In that case the "continuing" duty was simply to *avoid* "misus[ing] Wolverine's confidential information or to solicit its employees [and] to ensure that Wolverine would remain similarly obligated to maintain the confidentiality of Aeroglide's information and to refrain from soliciting Aeroglide's employees for a three-year period.

But, we are not left only with common sense:  the authorities make clear that in circumstances like the ones here at issue personal jurisdiction is present.

The Massachusetts Long Arm statute itself singles out only one kind of business as grounds for the assertion of personal jurisdiction by its courts.  Mass. Gen. Laws c. 223A, §3, extends the reach of Massachusetts courts to any entity "contracting to insure any person, property or risk located within this commonwealth at the time of contracting."   By signing the CMA, CGU engaged in exactly the kind of activity singled out by this provision:  it has entered into an "unconditional" and "continuous" guarantee of the solvency of Massachusetts-based ALAC.  As the Complaint alleges and CGU does not deny, that guarantee was used, in Massachusetts, to improve the profitability – again, in Massachusetts – of annuities sold to the Plaintiff and the entire proposed class.[2]  [*See* Doc. No. 28, ¶3].  There is a long line of authority requiring insurance companies to defend in a jurisdiction where they have guaranteed a risk; indeed the line prominently features even cases from the U.S. Supreme Court, which has held specifically that an insurer need not physically set foot in a state to subject to personal

---

[2] Plaintiff recognizes that CGU's guarantee is coupled with its assertion that, by extending this guarantee, CGU "is not acting as a reinsurer or an insurance company."  Whitehead letter, Exhibit A to Cooper Declaration.  [Doc. No. 31-1].  But the courts are clear that what determines personal jurisdiction is the underlying economic reality of the actions at issue, not the names given to those actions:

> We look toward the economic reality of the Fund's activities and conclude that the Fund "purposefully directed" its commercial efforts toward California residents. The substance, not form, of the defendant's activities is dispositive. *See Southern Machine Company v. Mohasco Industries, Inc.*, 401 F.2d 374, 382 (6th Cir. 1968) ("the technicalities of the execution of the contract and the contractual provision that the contract was made in New York . . . cannot change the business realities of the transaction"). *See also Thomas P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1254 (9th Cir. 1980); *Forsythe v. Overmyer*, 576 F.2d at 784 n.7

*Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392 (9th Cir. 1986).  The economic reality of the CMA, both in purpose and effect, is to shift away from annuity purchasers, and to CGU, the risk of insolvency by Massachusetts-based ALAC.

jurisdiction there if it has insured a risk in the state.  See, e.g., *McGee v. International Life Ins. Co.,* 355 U.S. 220 (1957).   See also *Wolfman v. Modern Life Ins. Co.,* 352 Mass. 356 (1967).

In *McGee.* the court explained why those who have acquired the protection of insurance should be able to enforce it in the state where the promise had an impact.  Those who had purchased such protection "would be at a severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable. When claims were small or moderate individual claimants frequently could not afford the cost of bringing an action in a foreign forum -- thus in effect making the company judgment proof." 355 U.S. at 223. Every one of those considerations applies here.  The annuity purchasers now before this Court would clearly find it a very substantial burden, if, in order to compel CGU to provide the protection it has promised, they were obliged to travel to a foreign country and retain counsel there. For many annuitants, the cost of proceeding in that burdensome way may very well render enforcement uneconomic.

This is the principle enforced by Massachusetts in Section 3(f) of its Long Arm statute. The CMA shifts from the Plaintiff, and the proposed class, and to CGU, the risk of insolvency by ALAC.  That agreement is therefore CGU's insuring "a risk" in Massachusetts. Section 3(f) therefore mandates that personal jurisdiction be found here.

The courts have not relied on section 3(f) where only a single entity is the beneficiary of a guarantee, but they nonetheless recognize that the extension of a guarantee to an entity in a particular jurisdiction properly forms the basis for the assertion of personal jurisdiction by the courts in that forum over the guarantor. That is the holding of the *Northern Laminates* case, 403 F.3d 14, in which a businessman, in New York, represented to a New Hampshire business that one of its customers was solvent.  There was not even a guarantee of solvency – only a

representation that continued extension of credit was safe.  The First Circuit found that this

representation itself was sufficient to warrant the assertion of personal jurisdiction over the New

York speaker by a New Hampshire court:

> Davis, knowing full well that his statements would induce NLS' reliance, made
> misrepresentations in the face of the knowledge that his statements would likely cause
> financial injury to NLS in New Hampshire. We find this sufficient to make it foreseeable
> to Davis that he might be held accountable for his misrepresentations in a New
> Hampshire forum. *See Hugel, 886 F.2d at 4* ("The knowledge that the major impact of
> the injury would be felt in the forum State constitutes a purposeful contact or substantial
> connection whereby the intentional tortfeasor could reasonably [**26] expect to be haled
> into the forum State's courts to defend his actions.").

*Northern Laminates,* 403 F.3d at 25.  *See also Deyesso v. Kaizen Mgmt., LLC*, 2008 U.S. Dist.

LEXIS 97413  ("The most incidental of purposeful contacts will satisfy the broadly construed

transacting business requirement of <u>section 3(a) [of the Massachusetts long arm</u>

<u>statute</u>]. *See <u>Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.</u>, <u>764 F.2d 928, 931 (1st</u>*

<u>Cir.1985)</u> (defendant transacted business under <u>Section 3(a)</u> by sending letters of guaranty into

Massachusetts); *Metcalfe v. Renaissance Marine, Inc*, 566 F.3d 324 (offering warranty to

purchasers in the Virgin Islands subjects the warrantor to personal jurisdiction there); *Trinetics*

*Int'l v. Dhl Air & Ocean Gen. Transp*., 2013 U.S. Dist. LEXIS 199 ("when a defendant

voluntarily guarantees the payment of a debt, that guarantee can contribute to finding minimum

contacts if the defendant should reasonably anticipate that its effects will be felt in the

forum. *See Steel Processors, Inc. v. Sue's Pumps, Inc. Rentals*, 622 So. 2d 910, 912-13 (Ala.

1993); *Ex parte Lord & Son Construction, Inc.*, 548 So. 2d 456 (Ala. 1989)").

The First Circuit's decision in *Bond Leather,* 764 F.2d 928, upon which CGU relies,

provides much useful analysis that, when read and applied thoughtfully here, make clear that this

Court does indeed have personal jurisdiction over CGU.

First, the Court of Appeals noted there that "the extent of a nonresident's involvement in the Massachusetts economy is properly relevant to the constitutional, not the statutory dimension of the jurisdiction inquiry. *Nova Biochemical v. Moller*, [629 F.2d 190] at 192-193 & n. 2; 194, n. 6. We thus reject the argument that the assertion of jurisdiction under § 3(a) is unauthorized here simply because M.N., Inc. has transacted no business *other than* the execution of the guaranty in question." *Id*. at 932.

Further, the First Circuit identified several factors that bear on the analysis. Those factors, applied here, show that CGU's motion should be denied. The *Bond Leather* court held, 764 F.2d at 934:

> the inquiry must narrow to whether the commercial action taken, in light of the contacts with the forum state it entailed, amounts to a purposeful decision by the nonresident to "participate" in the local economy and to avail itself of the benefits and protections of the forum. Thus, we reject appellee's argument that, *solely* by guaranteeing it payment for goods sold to Q-T, and thereby inducing it to sell goods, M.N., Inc. made a purposeful decision which is *independently* sufficient to support jurisdiction. *Accord First National Bank of Boston v. Bergreen*, [11 Mass. App Ct. 956 (1981)] (jurisdiction proper over nonresident guarantors only because guarantees are in aid of their own substantial investment in a Massachusetts corporation); *Salter v. Lawn*, [294 F.Supp. 882 (D. Mass. 1968] (jurisdiction proper over nonresident guarantor who guaranteed loans of corporation doing its principal business in Massachusetts where corporation acted as defendant's agent).

The negative inference to be drawn from this discussion is clear. In this case, by contrast to the facts in *Bond Leather*, CGU did not simply guarantee a small number of specific debts to a single beneficiary. Instead, it took on an "unconditional" and "continuing" obligation, which was broadcast by a Massachusetts business to its customers and used by that entity to solicit an entire book of business from thousands of people, all of whom then entered into contracts in Massachusetts on the basis of that assurance.

The First Circuit teaches further that no personal jurisdiction was present there because "[t]he guaranty agreement called for no active role by M.N., Inc." *Bond Leather*, 764 F.2d at

934.  Here, by contrast, CGU had "unconditional" and "continuing" duties under the agreement at issue.

More broadly, the First Circuit has recognized that action outside a forum that affects a contract within the forum can subject the actor to the personal jurisdiction of the forum's courts. Thus, in a line of cases of which *Astro Med, Inc. v. Nihon Kohden Am., Inc.,* 591 F.3d 1 (1st Cir. 2009) is a leading example, the First Circuit has held that one acting outside a state who tortiously interferes with a contract entered into within the state has thereby subjected himself the personal jurisdiction of the state where the contract was formed.  The principle applied in these cases is a simple one: action that has an impact on a contract in a forum appropriately results in the assertion of personal jurisdiction related to that action.  Here, the defendant's action caused Plaintiff and the proposed class to enter into the contract in Massachusetts, rather than interfering with that contract. But the issue is the extent and significance of the impact, not whether it helped to bring the contract about or helped to bring it to an end.

### 3.  It Is More Than "Reasonable" To Find Personal Jurisdiction Over CGU

Finally, a court properly asserts personal jurisdiction over a party if the Court determines that the assertion of such power over that person is "reasonable." *United Elec. Workers, 960 F.2d at 1089*.  In assessing reasonableness the Supreme Court has provided a set of "gestalt factors" to consider, *see World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980). These include: the defendant's burden of appearing; the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and the shared interest of the several States in furthering fundamental substantive social policies. See also *Burger King Corp.,* 471 U.S. at 477.

Given that all of the other Defendants in this case are subject to the jurisdiction of this Court and have already answered the Complaint, the merits of this controversy will go forward in this forum.  The interest of the court system in efficiency – and frankly, the Defendants' own interest in efficiency – militate in favor of adjudicating the issues once, and therefore here, rather than here and elsewhere.  There will be no significant incremental burden on the corporate entity CGU from litigating here:  here, as anywhere else, it will hire counsel to defend itself and that counsel will appear.  Because the controversy is to be adjudicated here, CGU will be called upon to produce documents here regardless of whether it remains a party or is dismissed.  Either way, CGU will be producing material here, either as a party or through the more cumbersome mechanism of discovery through the Hague Convention.

## CONCLUSION

CGU has acted intentionally to cause a continuing impact on this Forum.  For that reason, and for the remaining reasons set forth in this Memorandum, the Court should deny CGU's Motion to Dismiss for lack of personal jurisdiction.

Dated:  February 26, 2016                    Respectfully submitted,

*/s/ Jerome M. Marcus*
Jerome M. Marcus
jmarcus@marcusauerbach.com
Jonathan Auerbach
auerbach@marcusauerbach.com
Marcus & Auerbach LLC
1121 N. Bethlehem Pike, Suite 60-242
Spring House, PA 19477
Telephone: (215) 885-2250
Facsimile: (888) 875-0469
*Admitted Pro Hac Vice*

/

*/s/ Paul J. Klehm*
Paul J. Klehm (BBO#561605)
pklehm@kkf-attorneys.com
James B. Krasnoo (BBO#279300)
jkrasnoo@kkf-attorneys.com
Benjamin L. Falkner (BBO#667951)
bfalkner@kkf-attorneys.com
Krasnoo, Klehm & Falkner LLP
28 Andover Street, Suite 240
Andover, MA 01810
Telephone: (978) 475-9955
Facsimile: (978) 474-9005

*Attorneys for Plaintiff and putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2016, a true and correct copy of the foregoing Plaintiff's Opposition to the Motion of Defendant Aviva International Insurance Limited (Formerly CGU International Insurance, Plc) to Dismiss for Lack of Personal Jurisdiction was served on counsel of record via the Court's CM/ECF system.

*/s/ Jerome M. Marcus*
Jerome M. Marcus