**Exhibit 1**



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____ :
JOHN W. GRIFFITHS (on behalf of himself      :
and others similarly situated)             :
                                         :
                    Plaintiffs         :
                                         :
                  v.              :
                                         :
AVIVA LONDON ASSIGNMENT        :
CORPORATION, AVIVA LIFE INSURANCE    :
COMPANY, AVIVA INTERNATIONAL      :
INSURANCE LTD, f/k/a CGU            :
INTERNATIONAL INSURANCE, Plc,      :
ATHENE HOLDING, LTD,           :
ATHENE LONDON ASSIGNMENT       :
CORPORATION and                :
ATHENE ANNUITY AND LIFE COMPANY  :
                                         :
                  Defendants.    :
_____

Expert Report
by

Stephen J. Scherf, CPA/CFF, CFE

August 4, 2017



# TABLE OF CONTENTS

1. INTRODUCTION AND BACKGROUND ................................................................................. 2

2. BASIS FOR ANALYSIS ...................................................................................................... 5

3. ANALYSIS ...................................................................................................................... 6

   **3.1. Impact of the Guarantee** ...................................................................................... 7

   **3.2. Financial Implication of Lack of Guarantee on Pricing** ................................... 9

   **3.3. Damages** ............................................................................................................ 12

      *3.3.1. Scenario 1 – Pricing Differential of 106 Basis Points* ..................................... 13

      *3.3.2. Scenario 2 – Pricing Differential of 50 Basis Points* ....................................... 14

      *3.3.3. Damages are consistent with Documents and Testimony* ............................... 15

   **3.4. Additional Damages** ......................................................................................... 16

   **4. CONCLUSION** ............................................................................................................ 16


# JOHN W. GRIFFITHS ET AL. V. AVIVA LONDON ASSIGNMENT CORPORATION ET AL.

I have been engaged by Marcus & Auerbach, LLC ("Counsel") on behalf of their clients, John W. Griffiths ("Griffiths") and others similarly situated ("Class Members" or "Plaintiffs") to determine economic damages sustained by Plaintiffs as a result of the actions of the Defendants.[1] Included in the Amended Complaint are counts for breach of contract, breach of fiduciary duty, promissory estoppel and unjust enrichment.

My analysis is based on the assumption of liability. This assumption is necessary as a basis for my analysis. I have not been engaged to provide any opinions on liability, and as such I have formed no opinions on liability. Assuming liability, I have calculated the economic damages related to the counts in the Amended Complaint.[2]

This report sets out the results of my analysis and is structured as follows:

---

[1] Aviva London Assignment Corporation ("Aviva LAC"), Aviva Life Insurance Company ("Aviva Life"), Aviva International Insurance Ltd f/k/a CGU International Insurance, plc ("CGU") (collectively, the "Aviva Defendants"), Athene Holding, Ltd, Athene London Assignment Corporation ("Athene LAC") and Athene Annuity and Life Company ("Athene Annuity and Life").

[2] While the damages calculated include elements of unjust enrichment, I reserve the right to update my calculation should additional information come to my attention.

1.      Introduction and Background
2.      Basis for Analysis
3.      Analysis
4.      Conclusions
        Exhibits
        Appendices

# 1. INTRODUCTION AND BACKGROUND

Aviva Life Insurance Company ("Aviva Life") sold certain annuities ("the Guaranteed Annuities") to the public which included a guarantee provided by an entity which Aviva Life identified as an indirect parent, Defendant Aviva International Insurance Ltd f/k/a CGU International Insurance, plc ("CGU"). The guarantee, which was held out to buyers as a source of great financial strength, was a written and binding promise (referred to as a Capital Maintenance Agreement, and which will be referred to hereafter as "the CMA Guarantee" or "the CMA") that CGU would stand behind the Guaranteed Annuities by ensuring that the company responsible for paying the Guaranteed Annuities would always have sufficient assets to do so (i.e. that the company would remain solvent so that the Guaranteed Annuity payments could be made). The Guaranteed Annuities were issued by Aviva Life, and assigned to Aviva London Assignment Corporation ("Aviva LAC"), so that payments on these annuities were to be made by Aviva LAC. The CMA Guarantee covered these obligations of Aviva LAC.

It is my opinion that the Guaranteed Annuities commanded a higher price than they would have absent the CMA Guarantee because the financial strength of the CMA Guarantee, and of Defendant CGU, lowered the risk associated with the purchase of the Guaranteed Annuities. This is consistent with finance and valuation theory, which indicates that there is a correlation between risk and return, all else held constant. Ratings agencies evaluate the relative strength of the issuer of a financial instrument such as an annuity, or a particular financial instrument, such as a bond, in order to help investors evaluate the level of risk, and therefore, the overall value of the instrument, given the quoted pricing. The major investment rating agencies include Moody's and Standard & Poor's ("S&P"), while A.M. Best is known, in particular, for insurance company ratings. In order to assess the relative strength of the issuer, the rating agency examines

management, operating performance, and the balance sheet, and issues both a detailed report describing their findings, as well as a letter grade that allows for easy comparison. Issuers may not be rated by all rating agencies as they must request and pay to receive each rating. The letter grades issued by the rating agencies differ, but each has a series of ratings that are considered high or medium credit quality, which are collectively referred to as "investment grade" and low credit quality. As will be discussed in more detail in the sections that follow, the evidence indicates that in order for annuities to be purchased by customers, they must be investment grade. A summary of the basic investment grade ratings available from S&P and Moody's agencies is set out in *Table 1* below.

**Table 1 – Investment Grade Ratings**

| S&P | Moody's |
|-----|---------|
| AAA | Aaa |
| AA | Aa |
| A | A |
| BBB | Baa |

A.M. Best ratings are grouped somewhat differently and use a series of modifiers, such as numbers, "+" and "–" symbols to reflect a gradation of financial strength within the category. A.M. Best's rating categories are A+ Superior, A Excellent, B+ Good, B Fair, etc. The evidence I have reviewed shows that in order to effectively sell structured settlement annuities in the marketplace, the seller requires an A.M. Best ratings of A+ or higher, as very few companies with lower rating sell these products and moreover no such lower-rated company has an appreciable market share.

In my opinion, the CMA Guarantee and backing by CGU lowered the overall risk associated with the Guaranteed Annuities, and caused Griffiths and the other Class Members to effectively pay a higher price for the Guaranteed Annuities than they would have absent the CMA Guarantee.[3] If

---

[3] Because of the tax-protected status of structured settlement annuities, funds used to purchase such instruments are not, nominally, owned by the beneficiary of the annuity. It is my opinion, however, that the beneficiary has effective control over whether a structured settlement annuity will be purchased on the beneficiary's behalf, from whom, and on what terms. In particular the annuitant decides whether to spend the money available for purchase of a structured settlement annuity on a riskier annuity, which will provide a higher payout but with more risk, or a less risky annuity, which will provide a lower payout but with lower risk. From an economic standpoint, therefore, the beneficiary is effectively the purchaser, and I have treated the beneficiary as the purchaser for purposes of my analysis.

they are to receive the benefit of the bargain they made at the date they purchased the Guaranteed Annuities (i.e. instruments backed by the financial strength and guarantee of Defendant CGU, and with a risk profile reflecting the CMA Guarantee), they would have to receive an amount as damages that reflects this increment in price which they paid because they were promised, but did not in fact receive, this reduction in the risk associated with the annuities they were to receive.

The number of Guaranteed Annuities sold by year is summarized in **Table 2**.

**Table 2 - Guaranteed Annuities Sold by Year[4]**

| Year | Number of Active Policies | Premium Paid for Active Policies | Number of Inactive Policies | Premium Paid for Inactive Policies |
|------|---------------------------|----------------------------------|------------------------------|-------------------------------------|
| 2001 | 4 | $1,299,000 | 0 | $0 |
| 2002 | 164 | 54,952,174 | 51 | 10,524,200 |
| 2003 | 185 | 58,269,177 | 109 | 22,849,387 |
| 2004 | 238 | 64,374,012 | 120 | 16,671,969 |
| 2005 | 352 | 99,483,835 | 129 | 12,503,604 |
| 2006 | 929 | 241,809,832 | 113 | 18,924,286 |
| 2007 | 1,113 | 299,231,790 | 111 | 11,947,916 |
| 2008 | 1.200 | 361,596,644 | 66 | 9,151,938 |
| 2009 | 81 | 19,621,144 | 3 | 423,835 |
| **Total** | **4,265** | **$1,200,637,608** | **702** | **$102,997,134** |

After all of the Guaranteed Annuities were sold to the Class Members, the Aviva Defendants sold Aviva Life and Aviva LAC to a new entity, Defendants Athene Holding, Ltd., in a transaction pursuant to which Defendant Athene Holding, Ltd became responsible for satisfaction of the Guaranteed Annuities. They also purported to terminate the CMA Guarantee after amending it to delete language restricting their ability to do so. As a result, Athene and Aviva claim that the CMA Guarantee is no longer in force.

I understand, and have assumed for purposes of my damage calculation, that the Aviva Defendants have taken the position that the CMA Guarantee could have been withdrawn at any time.[5] As a result, from a financial standpoint, if this claim is correct then it is my opinion that the Guaranteed Annuities were never truly guaranteed. In essence, the Guaranteed Annuities were represented to

---

[4] Athene London Assignment Corporation Answers to Plaintiffs First set of Interrogatories and Second set of Requests for Production of Documents.

[5] See June 15, 2017 Deposition of Neil Harrison, pages 26 -27, 30- 30 and 81 – 90 and June 14, 2017 Deposition of Kirsty Cooper, pages 27 – 31.

the public as having a particular risk profile which commanded a certain price, when in fact, the risk was greater. Therefore, it is my opinion that the Class Members overpaid for said annuities.

## 2. BASIS FOR ANALYSIS

The analysis and opinions in this report are based upon my education, my experience in performing similar financial analyses and economic damage calculations, the information and documentation identified to date, documents and testimony in the record, accepted damages methodologies and approaches, and relevant case law. I am a Principal and founding member of Asterion, a consulting firm that provides financial and economic consulting services along three integrated service lines: Forensics, Valuation and Intellectual Property. I have been qualified and have presented testimony on numerous occasions, including the presentation of economic damages and financial analysis in courts throughout the United States. I am a Certified Public Accountant, Certified in Financial Forensics, and have a Master of Science with a concentration in Finance and an Advanced Professional Certificate in Taxation. Attached, as *Appendix A*, is my current *curriculum vitae* and information concerning testimony history, publications and speaking engagements.

My analysis is based on the documentation listed in *Appendix B*. In addition to the documents produced by the parties and deposition transcripts, publicly available information was also considered.

The documents and information utilized in performing this analysis are the types of documents and information experts in my field typically rely upon in performing such an analysis. I and others under my direct supervision, have performed the analysis contained in this report with the information available to date.

I understand that additional information may come to my attention during this litigation which may affect my analysis. Accordingly, I reserve the right to amend my analysis and this report should additional or updated information become available. In addition, I reserve the right to prepare additional supplemental materials such as summaries, graphical exhibits or charts for trial,

as well as to provide opinions and other materials in response to any expert opinions provided on behalf of the Defendants.

My firm is being compensated at $475 per hour for my time in this matter. My firm's compensation is not contingent upon the outcome of this litigation.

My analyses were performed solely with respect to the above referenced litigation. This report is not to be reproduced, distributed, disclosed or used for any other purpose.

## 3. ANALYSIS

My damages calculation measures the amount that Griffiths and his fellow Class Members overpaid for the Guaranteed Annuities, given the fact that they were not truly guaranteed.

In preparing my calculations, I first analyze the importance of the CMA Guarantee as it relates to the Defendants' ability to sell the product to the Class Members. I then analyze the implications of the loss of the CMA Guarantee on the underlying risk ratings and price of the instruments. Finally, I compute damages to the Class Members as the overpayment based on the modified level of risk.

### 3.1. Impact of the Guarantee

A series of 2003 internal memorandums of the Aviva Defendants indicate the importance of ratings, and particularly the CMA Guarantee, in the Aviva Defendants' ability to sell the annuities. The memorandums appear to have been generated in response to A.M. Best lowering its financial strength ratings for Aviva Life Insurance Company and its affiliate, Aviva Life Insurance Company of New York (formerly the CGU Life Companies) from A+ to A, with a "negative outlook."[6]  These documents show that Aviva Life agreed to pay the issuer of the CMA Guarantee 50 basis points on the premium received for every annuity covered by the CMA Guarantee. I understand that on or about November 2008, the rating was increased back to A+, but despite the increase, the CMA Guarantee was not removed from the Guaranteed Annuities and Aviva Life continued to pay 50 basis points for each annuity it sold that was covered by the CMA. This would tend to indicate that the CMA Guarantee remained valuable to Aviva Life even after the rating was returned to A+, because it either enhanced Aviva Life's ability to sell the Guaranteed Annuities, or made possible such sales when they would otherwise not be possible at all.[7]

Below are excerpts from the Aviva Defendants' internal memorandums:

> We recognize that the Structured Settlements market demands strong ratings from its life company providers. We will, over the next 30 days, be evaluating our continued operation in the marketplace. In the meantime, we will continue to honor our lock-in and other commitments; however, we will release them if you and your clients wish us to do so.[8]

> I believe Aviva can be successful in this market as an "A" rated company by continuing to bring you:
> • Competitive rates supported by a conservatively managed investment portfolio;
> • A dedicated underwriting unit and competitive rated ages;
> • The availability of a powerful secondary guarantee - the Capital Maintenance Agreement ("CMA") from a UK affiliate with strong S&P and Moody's ratings;
> • A complete product line, including Reinsurance Treaties for older Workers Comp cases, Assigned Attorneys Fees (including on a stand-alone basis) and Funding Agreements;
> • Personalized and high quality service;

---

[6] ATH_00005151.

[7] See May 18, 2017 Deposition of Debra Fickett-Wilbar pages 32 -35, and May 25, 2017 Deposition of Richard Kypta pages 56 – 60 and June 14, 2017 Deposition of Kirsty Cooper, pages 34 – 35  concerning the market for Structured Settlement Annuities.

[8] ATH_00005151.

• Regional marketing support from Platinum Insurance Marketing; and
• Enhanced support from Medivest for Workers' Comp cases.

You recently received some new marketing materials on Aviva the Company. We are now developing new Structured Settlements marketing materials for you to share with your clients. Included with this bulletin you'll find the first of these items - a flyer that explains how the CMA works and the relationships of the Aviva Life companies, Aviva Plc and CGU International Insurance Plc, the provider of the CMA.[9]

**Q:** Why did AM Best lower Aviva's rating from A+ to A?

**A:** Unlike past ratings, this rating was assigned on the basis that the Aviva life companies in the US are stand-alone entities. AM Best gave us no credit for the implicit and explicit support, like the Capital Maintenance Agreement, that we receive from our parent company, Aviva plc. Once AM Best decided to rate us on a stand-alone basis, they took action as a function of the significant increase in our level of new business, which has led to a reduction in the company's risk-adjusted capitalization and statutory operating earnings. It is important to understand that, in the life insurance business, significant increases in sales typically result in a short-term decline in statutory operating earnings. This increase in sales was planned for and has been continuously funded by capital infusions from our parent company.

**Q:** Why did AM Best change the basis of its rating of Aviva to a stand-alone basis?

**A:** AM Best recently reviewed its approach to the ratings of subsidiary companies. They are now requiring a full, interactive rating of the parent company in order to take into account the support of that parent for a subsidiary that they already rate. Aviva plc already works with two other major ratings agencies, S&P and Moody's, and does not need an AM Best rating in order to operate in its European and Asian markets. This means that right now, AM Best can only use publicly available information in considering the level of support Aviva plc gives to us.

**Q:** Does the rating action reflect a change in Aviva plc's support for the US Life Companies?

**A:** No. Our parent company, Aviva plc, remains committed to having a presence in the US and has consistently reiterated its long-term support for our Company, as demonstrated by its provision of the CMA and capital infusions of $56 million in 2001, $60 million in 2002, and additional planned capital infusions in 2003.[10]

**Q:** Some of my clients use the standards adopted by the National Conference of Commissioners on Uniform State Laws in the model Uniform Periodic Payment of Judgments Act of 1990. Does Aviva meet these standards?

A: We believe that, when the CMA assignment company is used on an Aviva structured settlement annuity, we do meet these standards. Both Aviva and CGU International Insurance plc ("CGUII") have capital and surplus in excess of $100 million and CGUII has two strong ratings as required by the model act: AA- from Standard & Poors and Aa2 from Moody's.[11]

---

[9] ATH_00005152.
[10] ATH_0005154.
[11] ATH_0005155.

The Aviva Defendants' internal memorandums help demonstrate how important ratings are in order for customers to purchase the annuities. The evidence shows that in order for the annuities to be purchased by customers, they must be of investment grade or better. According to Richard Krypta, the market for structured settlement annuities is dominated by highly rated companies, with >88% of all sales by A double plus or A plus companies.[12] In addition, the following excerpt from an Aviva Defendants document notes that companies unable to achieve an A+ rating have exited the marketplace within weeks of their downgrade below A+.

> The failure in the late 1980s of Executive Life, a key life company in the industry, led to an increased emphasis on life company financial strength and ratings. An A+ A.M. Best rating was adopted by the industry as a minimum standard. Ratings of AA- from S&P or Fitch and Aa3 from Moody's are also considered to be strong. The only "A" rated companies in the structured business have been those that are fed business by affiliated general insurers. A+ companies that were downgraded by A.M. Best typically exited the business within weeks.
>
> Our challenge: There has never been a successful "A" rated independent life company. [13]

Based on the foregoing communications, it is apparent that the Aviva Defendants were aware of the importance of their ratings as it relates to their ability to operate in the structured settlement marketplace and sell annuities. In addition, the Aviva Defendants utilized the CMA Guarantee as a way to bolster their ratings, referring to it as a "powerful secondary guarantee," and creating marketing materials specifically to describe how the CMA Guarantee worked and the relationship amongst the Aviva Defendants.[14]

### 3.2. Financial Implication of Lack of Guarantee on Pricing

Investors are concerned with risk when choosing between different investment opportunities. Fundamentally, investors need to be compensated for the acceptance of additional risk in the form of higher returns. The following factors in the record indicate that the CMA Guarantee had a

---

[12] May 25, 2017 Deposition of Richard Kypta, page 58. Further illustrating the point I understand that in 2006 only 14 insurers were issuing structured settlement annuities and 11 of those insurers (representing more than 96% of the entire market share) has an A.M. Best rating of A+ or A++.
[13] GRIFFITHS-CGU-0007360.
[14] ATH_00005152.

quantifiable value, and without the CMA Guarantee, the Guaranteed Annuities would have been sold for a lower price, if they could have been sold at all.

- The Aviva Defendants paid 50 basis points to CGU for the CMA Guarantee,[15] implying that the CMA Guarantee was worth at least 50 basis points of the purchase price in the marketplace.

- After Aviva Life's rating was increased back to A+ on or about November 2008, the CMA Guarantee remained in place, indicating that the Aviva Defendants' representatives still viewed the CMA Guarantee as worth at least 50 basis points because of its enhancement to their ability to sell the Guaranteed Annuities at the price they were achieving in the marketplace.[16]

In order to measure the pricing variation in annuities due to changes in perceived risk, and more specifically, the potential difference in price that would have resulted had the CMA Guarantee not been in place, I analyzed how the financial markets quantify changes in perceived risk. In the marketplace, investors rely upon various rating agencies to provide information on the relative risk of the investments that they purchase. I understand that at the time of the CMA Guarantee, CGU had a rating of AA- from Standard & Poor's and Aa2 from Moody's. Daily rate data on investments rated AA- from Standard & Poors' and Aa2 from Moody's are not tracked by the Federal Reserve. As a result, I reviewed yields on instruments with Moody's Aaa ratings as well as those with Baa ratings during the period 2001 to 2009 using data available from the St. Louis Federal Reserve.[17]    As shown in *Exhibit 2*, the average difference in yield between these instruments during this time period was 116 basis points. Given that CGU was not Aaa, but rather Aa2, I then reduced this difference by 10 basis points based upon empirical studies on the long term differences in yield between Aaa and Aa securities and my analysis of the historical differences during the relevant time period. The resulting 106 basis point spread therefore represents the return associated with the additional risk in an instrument with a Moody's Baa rating

---

[15] ATH_00004324 – ATH_00004326.
[16] Most life companies offered some sort of secondary guarantee on their structured settlement annuities to make them more attractive to the beneficiaries. See May 25, 2017 Deposition of Richard Kypta, pages 54 -55.
[17] *Exhibit 2.*

as compared to an Aa2 rated instrument. In my opinion, to the extent the Guaranteed Annuities could have still been sold absent the CMA Guarantee, this 106 basis point spread represents an appropriate proxy for the rate that a financial investor would demand for the additional risk inherent in the Guaranteed Annuities.[18]

Given the need for an A+ rating to sell these securities and the lack of sales by companies with lower ratings, as discussed in the previous section, I believe that without the CMA Guarantee, the Guaranteed Annuities would not have been viewed as investment grade in the marketplace. In order to determine the additional required yield for a non-investment grade annuity, I analyzed data available from the St. Louis Federal Reserve, including differentials for BofA Merrill Lynch US Corporate AAA Option-Adjusted Spread© to BofA Merrill Lynch US High Yield BB Option-Adjusted Spread© during the period 2001 to 2009,[19] and differentials between BofA Merrill Lynch US Corporate AAA Effective Yield© and BofA Merrill Lynch US High Yield BB Effective Yield© during the period 2001 to 2009.[20] As shown in *Exhibits 3A* and *3B*, the average difference in yield between the AAA and BB[21] instruments during this time period was 331 and 330 basis points, respectively. Adjusting for the 10 basis points described above would result in a yield difference of 320 basis points. As a result, if the annuities were not of investment grade credit quality, the yield required would have been 320 basis points higher than the yield on the Guaranteed Annuities.

---

[18] Financial markets price risk on the basis of risk-neutrality. Individual consumers, however, are risk averse, in part because, as individuals, they are unable to reduce risk by spreading it. For example, individual purchasers of insurance cannot spread the risk associated with the uncertainty about how long they will live across a large sample of lives. Similarly, the annuity from which they will be paid can only be purchased from one company, so they cannot spread the risk associated with the possibility that that company will become insolvent at some point in the future. Because individuals are constrained in this way, they are more sensitive to increases in risk than are those entities which drive the pricing of corporate debt in the financial markets. Therefore, the increase or decrease in the price of corporate debt defined in this report, and associated with different levels of risk, significantly understate the value of that increment in risk to an individual. The damages figures set out here are therefore a conservative underestimate of the damages the Plaintiffs suffered as a result of Defendants' understatement of the risk associated with the annuities at issue in this case.

[19] *Exhibit 3A.*

[20] *Exhibit 3B.*

[21] BB is the highest rating that is not considered investment grade.

### 3.3. Damages

To date, Defendants have provided a sample of Class Member files (584).[22] In addition, the Defendants produced summary data concerning the premium paid by year for the Guaranteed Annuities,[23] actual annuity payments from 2002 through 2016,[24] and a projection of all future payments to be made under the Guaranteed Annuities.[25] I have utilized the summary data provided in order to calculate damages to the entire class. My use of the actual summary data for the entire class is appropriate for calculating damages for the entire class, as it does not rely on a sample.[26]

Based upon facts presented in the record, I have computed damages under two alternative scenarios. *Scenario 1* is based upon the estimated difference in yield between an annuity with a Moody's Aa2 rating and a Moody's Baa rating, or a pricing differential of 106 basis points. *Scenario 2* assumes a 50 basis point increase in yield given the fact that Aviva Life paid 50 basis points of the purchase price of the Guaranteed Annuities to CGU in exchange for the CMA Guarantee.

The methodology for computing damages is the use of present value techniques to the financial characteristics of the Guaranteed Annuities purchased by the Class Members. The use of a present value methodology allows for each Class Member to be treated in a similar manner while still

---

[22] I have been informed that the same files were produced in a manner that sampled from files ordered chronologically, with every $n^{th}$ file produced by Defendant Athene. As a result, I believe and have assumed that the files produced should represent a random sample of the entire class. I analyzed the sample data to see that it was consistent with my calculations of damages to the Class Members and that the overall damage number could be properly allocated amongst the Class Members to fairly compensate them for their loss.

[23] Athene London Assignment Corporation Answers to Plaintiffs First set of Interrogatories and Second set of Requests for Production of Documents.

[24] Athene London Assignment Corporation Answers to Plaintiffs Second set of Interrogatories and Third set of Requests for Production of Documents.

[25] Excel Spreadsheet entitled "Copy of Star Runoff Estimate" produced by Athene 7-17-17 and related correspondence. I understand that this data does not include information on the NY policies sold by the Defendants, which represent approximately 10 percent of annuities issued. Accordingly, the damages that I have estimated may be understated by up to 10 percent.

[26] Individual data will be needed at a later date in order to allocate damages within the Class. This data will include the date of the annuity purchase, the purchase price, and the age or rated age of the annuitant, the payment streams, the length of payment, periodic payments and other terms. This data will be used to estimate the required cash flows so that an individual damage calculation can be computed or appropriately allocated from the whole.

enabling them to receive the appropriate financial compensation in the form of the overpayment in the initial price of the annuity. The steps in determining damages were as follows:

- Obtain information from the Defendants as to premiums paid for the Guaranteed Annuities for each year in which the policies were issued.
- Obtain information from the Defendants concerning the actual payments that were historically made to the Class Members for 2002 to 2016.
- Obtain information from the Defendants concerning the projected future payments that would be due under the Guaranteed Annuities for the years 2017 forward.
- Compute the effective yield on the Guaranteed Annuities for the Class.
- Determine the premium that should have been paid under *Scenarios 1* and *2* discussed below.
- Determine damages under *Scenarios 1* and *2* based upon the difference between the price that was paid and the price that should have been paid, given the modified risk.

### 3.3.1. Scenario 1 – Pricing Differential of 106 Basis Points

The facts in the record indicate that ratings of A+ or above were necessary in the marketplace for the sale of the Guaranteed Annuities.[27] Aviva Life was initially rated A+ by A.M. Best as late as May 2002. In the first quarter of 2003, the rating was downgraded to A, with a negative outlook. At this point in time, the CMA Guarantee was provided to augment the risk profile of the annuities. As a result, purchasers of the Guaranteed Annuities not only had the financial backing of Aviva Life and Aviva LAC, but could rely upon the CMA Guarantee that was provided by CGU, which I understand had a rating of AA- from Standard & Poor's and Aa2 from Moody's in the first quarter of 2003. Even when the Aviva Life rating was raised back to A+, the CMA Guarantee remained in place. *Scenario 1* computes damages by taking into account the higher yield required for the assumption of the risk given that the CMA Guarantee was illusory.

---

[27] See ATH_00025050 which shows that all of the top 15 providers of Structure Settlement Annuities were rate A or above, indicating that the market viewed providers without an A rating as non-investment grade.

Adjusting the yield on the Class Members Guaranteed Annuities by 106 basis points results in damages in the form of an overpayment by the Class for their annuities of $165,105,423. This calculation is set out in detail in **Exhibit 1A**.

### 3.3.2.  Scenario 2 – Pricing Differential of 50 Basis Points

The facts in the record indicate that Aviva Life paid 50 basis points of the purchase price of the Guaranteed Annuities to CGU for the CMA Guarantee.[28]  I therefore compute damages in the form of the amount that the Class Members initially overpaid for the Guaranteed Annuities by providing them an additional 50 basis point yield, since the CMA Guarantee was illusory.

Adjusting the yield on the Class Members Guaranteed Annuities by 50 basis points results in damages in the form of an overpayment by the Class for their annuities of $82,695,879. This calculation is set out in detail in **Exhibit 1B**.

### 3.3.3.  Alternative Calculation

Despite the fact that the Guaranteed Annuities were sold prior to the start of a given beneficiary's annuity period and that the annuities once purchased were not readily marketable, it is still possible to account for the measure of damages if it was determined that the breach of the obligation to Plaintiff and the Class did not occur until the CMA Guarantee was removed, upon sale of the Guaranteed Structured Settlement Annuities portfolio to Athene LAC in October 2013.[29] Assuming for the moment that, from a damages standpoint, if there should be an offset to account for the time period that the CMA Guarantee was in place,[30] the damages would be $134,907,065

---

[28] This agreement is between related parties and, from a financial perspective, should have been structured as a yield adjustment rather than a percentage of the purchase price of the annuity in order to properly account for risks.  I was provided internal documents which confirmed my view and revealed Aviva International Insurance Limited did not record the impact of the CMA Guarantee since it "was not identified until the transaction was flushed out."  See GRIFFITHS-CGU-0011278.

[29] I was not provided with payments on a monthly basis, as such, I discounted the payments for 2013 for the entire year, even though the change in the CMA Guarantee occurred in October 2013 resulting is a conservative calculation of damages since I included some payments which were made after the CMA Guarantee was removed.

[30] Whether an offset is appropriate is a legal conclusion for which I offer no opinion.

million under **Scenario 1** and $68,026,952 under **Scenario 2**, as set forth in **Exhibits 1A** and **1B**, respectively.

### 3.3.4.  Damages are consistent with Documents and Testimony

After performing my calculations above, I identified documentation produced in discovery that reveals the Aviva Defendants identified a possibility of a "residual risk of Promissory Estoppel." This AVIVA document[31] states:

> "(AII[32] should have reasonably expected the payee to rely, and the payee did in fact rely, on the ALAS CMA in its decision to enter into an agreement with ALAS[33] (effectively that a contract was formed between AII and the payee).

In addition, this same documented estimated that there would be "a residual EC[34] exposure of £[100]m."[35]

Another black-lined document states "Additionally, reflecting the full $125m figure assumes that policyholders would successfully take legal action to enforce the guarantee."[36]

In deposition testimony, Neil Harrison indicated that the amount of capital held for this issue as of December 31, 2013 was UK£90 million sterling.[37]   Given the exchange rate of 1.657413 on December 31, 2013, the amount in U.S. dollars would be $149,167,170.

---

[31] GRIFFITHS-CGU-0011179-0011180.
[32] Aviva International Insurance Limited.
[33] Aviva London Assignment Corporation.
[34] Economic Capital which was defined in the June 2, 2017 Deposition of Julian Chapman, page 81 as "the level of capital that you would need to ensure that you met your obligations." In the June 15, 2017 Deposition of Neil Harrison, pages 91-92., EC was defined as "the capital that we as a group are required to hold under the relevant insurance regulations against the risk to which the group is exposed."
[35] I understand that the transaction closed in or around October 2, 2013.  Given the exchange rate of 1.622469 on October 2, 2013, this amount in U.S. dollars would be $162,246,900.   It appears that this document may be as of November 22, 2012.  Given the exchange rate of 1.30955 on November 22, 2012 this amount in U.S. Dollars would be $130,955,000.
[36] GRIFFITHS-CGU-0011205-  0011206  and GRIFFITHS-CGU-0011252-  0011253.
[37] June 15, 2017 Deposition of Neil Harrison, pages 57 -65.

I note that these documents are consistent with my calculation of the damages suffered by Class Members. It is my opinion an insurance company's estimation of exposure to risk reflect its estimation of the financial magnitude of the risk multiplied by the probability that the risk will occur. In reaching this opinion, I rely upon my experience and note that my opinion is consistent with that of Linda Kaiser Conley. It is therefore reasonable to conclude that the amounts ascribed by the Defendants in their internal documents represent an alternative measure of damages of at least that amount as a result of the termination of the CMA Guarantee.

### 3.4. Additional Damages

In addition, Counsel has advised that Class Members may be entitled to additional damages at the time of trial such as prejudgment interest, litigation costs, expenses and attorneys' fees. If requested, I reserve the right to calculate these additional forms of damages at the time of trial.

## 4. CONCLUSION

Based on the documents received to date and the analysis discussed throughout this report, it is my opinion within a reasonable degree of professional certainty that Plaintiffs and the Class Members have sustained economic damages of $165,105,423 under *Scenario 1* and $82,695,879 under *Scenario 2*.[38]


Stephen J. Scherf, CPA/ABV, CVA
Principal

---

[38] See also alternative calculation for 2014 forward of $134,907,065 under *Scenario 1* and $68,026,952 under *Scenario 2*.

# Appendix A


PHILADELPHIA

215 S. Broad Street, 3rd Floor  *t* 215 893 9901
Philadelphia, PA 19107  *f* 215 893 9903

NEW YORK

575 Lexington Avenue, 4th Floor  *t* 646 495 9340
New York, NY 10022

# Appendix A
# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Principal

sscherf@asterion-consulting.com

**Biography**

Mr. Scherf has provided a wide array of accounting and consulting services to clients with an emphasis on business valuations, fraud investigations, bankruptcy, and litigation matters. Mr. Scherf has testified on numerous occasions in arbitrations, depositions and Federal Court. Mr. Scherf has taught for the American Institute of Certified Public Accountants, The National Association of Certified Valuators & Analysts and other professional organizations.

Mr. Scherf's employment experience includes "Big Four," regional and a "boutique" accounting firm. In the private sector, Mr. Scherf held officer positions at a $2.5 billion financial institution, a major real estate developer and an investment firm.

**Professional Memberships**

- FINRA Public Arbitrator
- American Institute of Certified Public Accountants
- Pennsylvania Institute of Certified Public Accountants
- Turnaround Management Association
- National Association of Certified Valuators & Analysts

- American Bankruptcy Institute
- American College Board of Forensic Examiners
- Association of Certified Fraud Examiners
- Association of Insolvency and Restructuring Advisors
- Institute for Internal Controls

**Education**

Mr. Scherf has a B.B.A. in Accounting from Temple University (1980) and a Master of Science in Finance (1986) and an Advanced Professional Certificate in Taxation (1987) from Drexel University. His education has been supplemented by various continuing education courses offered by a variety of professional organizations. He has spoken before professional and educational groups on various aspects of business valuation, litigation consulting, fraud investigations and economic damages.



| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2017 | Superior Court of New Jersey<br>Mercer County | Deposition | Mitchell L. Sussman v. Gold Gerstein Group, LLC et al. |
| 2017 | Court of Common Pleas<br>Philadelphia, PA | Trial | Neil Chesen et al. v. Sonya Bright |
| 2017 | Superior Court of New Jersey<br>Cape May County, NJ | Deposition | Michael McDonald et al. v. City of Wildwood |
| 2017 | United States District Court<br>Eastern District of Pennsylvania | Trial | Dalmatia Import Group, Inc. et al. v. FoodMatch, Inc. et al. |
| 2017 | United States District Court<br>Eastern District of Pennsylvania | Deposition | New Spring Mezzanine Capital II, LP  v. Baxter McClindon<br>Hayes et al. |
| 2017 | Court of Common Pleas<br>Bucks County, PA | Trial | Dawn Meadows v. Kevin Meadows |
| 2016 | United States District Court<br>Eastern District of Pennsylvania | Deposition | Dalmatia Import Group, Inc. et al. v. FoodMatch, Inc. et al. |
| 2016 | Court of Common Pleas<br>Northampton County, PA | Trial | Thomas B. Walden, M.D. v. Northampton Hospital Corporation<br>d/b/a Eastion Hospital et al. |
| 2016 | Superior Court of New Jersey<br>Burlington County | Deposition | Assigned Credit Solutions, Inc. v. AmeriGas Propane, L.P. |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
## Rule 26 Disclosure – Testimony

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|---|---|---|---|
| 2016 | United States District Court<br>District of Delaware | Trial | Air Products and Chemicals, Inc. v. Eric P. Wiesemann et al. |
| 2016 | Superior Court of New Jersey<br>Camden County | Deposition | Customers Bank v. Capital Financial Management Corp. et al. |
| 2015 | United States District Court<br>District of New Jersey | Deposition | Sam Younes et al. v. 7-Eleven, Inc. |
| 2015 | Court of Common Pleas<br>Philadelphia County, PA | Trial | Sandra Snitow v. Howard Snitow et al. |
| 2015 | United States District Court<br>Eastern District of Pennsylvania | Deposition | Gratz College v. Synergis Education, Inc. |
| 2015 | United States District Court<br>District of Utah | Deposition | N8 Medical, Inc. et al. v. Colgate Palmolive Company |
| 2015 | Court of Chancery<br>State of Delaware | Trial | Currency, Inc. et al. v. API Technologies, Corp. et al. |
| 2015 | Court of Common Pleas<br>Montgomery County, PA | Hearing | Joel Rosenwasser and Engraving Technologies, Inc. v.<br>C.J.D., Inc. et al. |
| 2015 | Court of Common Pleas<br>Luzerne County, PA | Hearing | Natalie Gunnshannon et al. v. Albert/Carol Mueller t/a<br>McDonalds et al. |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
## Rule 26 Disclosure – Testimony

| _Date_ | _Jurisdiction_ | _Type_ | _Matter_ |
|---|---|---|---|
| 2014 | Court of Common Pleas<br>Northampton County, PA | Trial | John Cancelliere et al. v. Buckno Lipsicky & Company et al. |
| 2014 | United States District Court<br>Eastern District of Pennsylvania | Trial | David's Bridal, Inc. v. CELS Enterprises, Inc. |
| 2014 | Court of Common Pleas<br>Delaware County, PA | Hearing | Joseph F. Delaney, III v. F. Sean Bonner and Carne Capital, LLC |
| 2014 | United States District Court<br>Eastern District of Pennsylvania | Deposition | David's Bridal, Inc. v. CELS Enterprises, Inc. |
| 2014 | United States District Court<br>District of New Jersey | Hearing | United States of America v. Ashokkummar R. Babaria |
| 2014 | Court of Chancery<br>State of Delaware | Trial | Kathryn Mennen et al. v. Wilmington Trust Company et al. |
| 2014 | Court of Chancery<br>State of Delaware | Deposition | Kathryn Mennen et al. v. Wilmington Trust Company et al. |
| 2014 | United States District Court<br>Eastern District of Pennsylvania | Trial | Pure Earth, Inc. v. Gregory Call v. Pure Earth Inc., et al. |
| 2013 | Court of Common Pleas<br>Bucks County, PA | Trial | Brian Opielski and Trimline Windows, Inc. v. Dennis Teeling et al. |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CTP, CVA
## Rule 26 Disclosure – Testimony

| *Date* | *Jurisdiction* | *Type* | *Matter* |
|--------|----------------|--------|----------|
| 2013 | Superior Court of New Jersey<br>Camden County | Trial | Ozcan Yildiz and Storm Master West v. Storm Master Co., Inc. et al. |
| 2013 | United States District Court<br>Eastern District of Michigan | Deposition | Fen F, LLc v. Taylor Gifts, Inc. |
| 2013 | United States District Court<br>District of Delaware | Deposition | Jonathan and Trude Yarger et al. v ING Bank, FSB |
| 2013 | Superior Court of New Jersey<br>Camden County | Deposition | Ozcan Yildiz and Storm Master West v. Storm Master Co., Inc. et al. |
| 2013 | Court of Common Pleas<br>Montgomery County, PA | Trial | Howard Lapensohn, Trustee v. Jill Lapensohn, Trustee et al. |
| 2013 | United States Bankruptcy Court<br>Eastern District of Pennsylvania | Trial | In Re: Amy L Styer<br>Commonwealth of Pennsylvania v. Amy L. Styer |



**Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA**
**Rule 26 Disclosure – Publications**

| _Date_ | _Publication_ | _Title_ |
|------|-------------|-------|
| 2016 | Law360 | _Using a Commercial Success Declaration in an IPR_ |
| 2011 | National Litigation Consultant's Review | _Fair Value Accounting's Impact on Damages_ |
| 2010 | National Litigation Consultant's Review | _Business Valuation in the "But For" World_ |
| 2007 | ABF Journal (Co-Author with G Urbanchuk) | _Newton and Fraud: What Goes Up Must Come Down_ |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2016 | Pennsylvania Bar Institute<br>Advanced Piercing the Corporate Veil | Philadelphia, PA |
| 2015 | Pennsylvania Bar Institute<br>Tales from the Shareholder Wars | Philadelphia, PA<br>Mechanicsburg, PA |
| 2015 | Pennsylvania Bar Institute<br>Minority Shareholder Freezeout Litigation | Philadelphia, PA |
| 2015 | Pennsylvania Bar Institute<br>Commercial Litigation Institute – Damages and Remedies | Philadelphia, PA |
| 2015 | National Business Institute<br>Handling the Sale of a Business | Philadelphia, PA |
| 2014 | National Association of Certified Valuation Analysts<br>Solvency and Insolvency Testing | Webinar |
| 2014 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | New Orleans, LA |
| 2014 | Pennsylvania Institute of Certified Public Accountants<br>AICPA Testing for Goodwill Impairment Guide | Philadelphia, PA |
| 2014 | Montgomery County Bar Association<br>Intersection of Forensic Accounting and Bankruptcy | Norristown, PA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2013 | Rutgers School of Law<br>Business Divorce | Camden, NJ |
| 2013 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Chicago, IL |
| 2013 | Pennsylvania Bar Institute<br>Advanced Piercing the Corporate Veil | Philadelphia, PA |
| 2013 | Accounting for Lawyers<br>Schnader Harrison Segal & Lewis LLP | Philadelphia, PA |
| 2013 | Pennsylvania Bar Institute<br>Business Divorce | Mechanicsburg, PA |
| 2012 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Philadelphia, PA |
| 2011 | Pennsylvania Institute of Certified Public Accountants<br>Ethics and Other Issues – An Update | Valley Forge, PA |
| 2011 | Pennsylvania Institute of Certified Public Accountants<br>Impairment Testing for Financial Reporting | Harrisburg, PA |
| 2011 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Orlando, FL |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2011 | National Business Institute<br>Accounting 101 for Attorneys | Allentown, PA |
| 2010 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Chicago, IL |
| 2010 | Pennsylvania Institute of Certified Public Accountants<br>Fair Value Measurements | Harrisburg, PA |
| 2010 | American Society of Appraisers - Southern<br>New Jersey Chapter<br>Lost Profits and Business Destruction Damage Claims | Cherry Hill, NJ |
| 2010 | Office of Auditor Accounts – State of DE<br>The Expert's Role and Testimony | Dover, DE |
| 2009 | National Association of Certified Valuation Analysts<br>Advanced Valuation Applications and Models | Jersey City, NJ |
| 2009 | Pennsylvania Institute of Certified Public Accountants<br>Financial Institutions Conference<br>Valuation and SFAS 141R | Hershey, PA |
| 2009 | Montgomery County Bar Association and the Greater<br>Philadelphia Chapter of the PICPA – Strategies for<br>Clients in the Current Economic Crisis | Norristown, PA<br>Philadelphia, PA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|---|---|---|
| 2008 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | San Diego, CA |
| 2008 | Pennsylvania Institute of Certified Public Accountants<br>Business Valuation Conference<br>FASB Valuation Issues | Harrisburg, PA |
| 2008 | Association of Government Accountants<br>Ponzi Schemes | Philadelphia, PA |
| 2007 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Washington, DC |
| 2007 | Fair Value Measurements SFAS 157<br>Pennsylvania Institute of Certified Public Accountants | Conshohocken, PA |
| 2007 | National Association of Certified Valuation Analysts<br>Normalizing and Projecting Earnings<br>Valuation Methods:  Alternatives and Decision Criteria | Philadelphia, PA |
| 2007 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Brookfield, WI |
| 2006 | Discounting of Damages, Selecting Appropriate Discount<br>Rate - Forensic & Litigation Services Conference<br>Pennsylvania Institute of Certified Public Accountants | King of Prussia, PA |



# Stephen J. Scherf, CPA/ABV/CFF, CDBV, CFE, CICA, CIRA, CTP, CVA
## Rule 26 Disclosure – Speaking Engagements

| *Date* | *Description* | *Location* |
|--------|---------------|------------|
| 2006 | Business Valuation: How to Make or Break Your Case<br>Montgomery County Bar Association<br>Pennsylvania Institute of Certified Public Accountants | Norristown, PA |
| 2006 | National Business Institute<br>Financial Statement Analysis for the Non-Financial<br>Advisor in Pennsylvania | Philadelphia, PA |
| 2006 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | San Antonio, TX |
| 2006 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Chicago, IL |
| 2005 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Ft. Lauderdale, FL |
| 2005 | National Association of Certified Valuation Analysts<br>Valuation Methods:  Alternatives and Decision Criteria | Jersey City, NJ |
| 2005 | National Association of Certified Valuation Analysts<br>Advanced Valuation and Case Study Workshop | Philadelphia, PA |
| 2005 | Association of Government Accountants<br>Philadelphia Chapter<br>Business Valuation Fundamentals and Techniques<br>Ownership and Acquisition Disputes and the Role of the<br>Forensic Accountant | Lester, PA |

# Appendix B

| Document Description | Bates Range | |
|---|---|---|
| Amended Complaint | | |
| Opinion regarding motion to dismiss | | |
| Athene London Assignment Corporation Answers to Plaintiffs First set of Interrogatories and Second set of Requests for Production of Documents | | |
| Athene London Assignment Corporation Answers to Plaintiffs Second set of Interrogatories and Third set of Requests for Production of Documents | | |
| Ringler Associates Letter Dated October 18, 2001 | HANAIKE0000229 | HANAIKE0000230 |
| Aviva Internal Memorandums | ATH_00005151 | ATH_00005156 |
| Excel Spreadsheet of Mortality Tables produced by Athene 7-17-17 and related correspondence | | |
| Excel Spreadsheet of Payout Example produced by Athene 7-17-17 and related correspondence | | |
| Excel Spresheet of STAR Run off Estimate produced by Athene 7-17-17 and related correspondence | | |
| Hanaike Letter October 18, 2001 | Hanaike 0000229 | Hanaike 0000230 |
| June 2, 2017 Deposition of Julian Chapman and related exhibits | | |
| June 15, 2017 Deposition of Neil Harrison and related exhibits | | |
| May 25, 2017 Deposition of Richard Kypta and related exhibits | | |
| May 18, 2017 Deposition of Debra Fickett-Wilbar and related exhibits | | |
| June 14, 2017 Deposition of Kirsty Cooper | | |
| Access to Plaintiff's Litigation document database | | |
| Industry and internet research including: | | |
| Information from databases maintained by St. Louis Federal Reserve | | |
| Information on Rating Agencies and Ratings | | |
| Reserach articles on risk and ratings | | |

# Exhibits

**John W. Griffiths v. Aviva London Assignment Corporation et al.**
**Guaranteed Annuities - Actual and Projected Payments**
**2001 to 2016 Actual and Adjusted - 2017 Forward Projected**
**Summary of Exhibits 1 through 1B**

| Scenario | Total Premium Paid | Adjusted Total Premium Paid | Annuity Payments | Net Cash Flow | PV Net Cash Flow | IRR | Reference |
|---|---|---|---|---|---|---|---|
| **Actual** | $ 1,302,335,743.00 | | $ (3,501,239,693.68) | $ (2,198,903,950.68) | $ 0.00 | 5.2% | Exhibit 1 |
| **Scenario 1: Modified to Reduce Premiums for Additional 106 Basis Points in IRR** | | | | | | | |
| | $ 1,302,335,743.00 | $ 1,137,230,320.00 | $ (3,501,239,693.68) | $ (2,364,009,373.68) | $ 0.00 | 6.3% | Exhibit 1A |
| **Total Damages** | | $ 165,105,423.00 | | | | | |
| Less: Offset through 2013 | | 30,198,358.41 | | | | | |
| **Damages from 2014 Forward** | | $ 134,907,064.60 | | | | | |
| **Scenario 2: Modified to Reduce Premiums for Additional 50 Basis Points in IRR** | | | | | | | |
| | $ 1,302,335,743.00 | $ 1,219,639,864.30 | $ (3,501,239,693.68) | $ (2,281,599,829.38) | $ 0.00 | 5.7% | Exhibit 1B |
| **Total Damages** | | $ 82,695,878.70 | | | | | |
| Less: Offset through 2013 | | 14,668,926.24 | | | | | |
| **Damages from 2014 Forward** | | $ 68,026,952.46 | | | | | |

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Actual - 2017 Forward Projected
Exhibit 1

| Year | | Premium Paid for Active Policies | Premium Paid for Active Policies | Total Premium Paid | | Payments | | Net Cash Flow | PV Factor | | PV Net Cash Flow |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2001 | [1] | $ 1,299,000.00 | $ - | $ 1,299,000.00 | | $ - | $ | 1,299,000.00 | 0.9505 | $ | 1,234,745.71 |
| 2002 | [1] | 54,952,174.00 | 10,524,200.00 | 65,476,374.00 | [2] | (7,224,197.21) | | 58,252,176.79 | 0.9035 | | 52,631,883.16 |
| 2003 | [1] | 58,269,177.00 | 22,849,387.00 | 81,118,564.00 | [2] | (5,497,734.01) | | 75,620,829.99 | 0.8588 | | 64,945,126.24 |
| 2004 | [1] | 64,374,012.00 | 16,671,969.00 | 81,045,981.00 | [2] | (10,384,459.22) | | 70,661,521.78 | 0.8163 | | 57,684,148.61 |
| 2005 | [1] | 99,483,835.00 | 12,503,604.00 | 111,987,439.00 | [2] | (17,372,774.98) | | 94,614,664.02 | 0.7760 | | 73,417,624.36 |
| 2006 | [1] | 241,809,832.00 | 18,924,286.00 | 260,734,118.00 | [2] | (26,836,513.44) | | 233,897,604.56 | 0.7376 | | 172,518,639.77 |
| 2007 | [1] | 299,231,790.00 | 11,947,916.00 | 311,179,706.00 | [2] | (41,778,001.07) | | 269,401,704.93 | 0.7011 | | 188,876,952.26 |
| 2008 | [1] | 361,596,644.00 | 9,151,938.00 | 370,748,582.00 | [2] | (59,221,630.07) | | 311,526,951.93 | 0.6664 | | 207,607,303.42 |
| 2009 | [1] | 19,621,144.00 | 423,835.00 | 20,044,979.00 | [2] | (70,473,395.16) | | (50,428,416.16) | 0.6335 | | (31,944,103.55) |
| 2010 | | | | | [2] | (76,121,148.39) | | (76,121,148.39) | 0.6021 | | (45,834,139.65) |
| 2011 | | | | | [2] | (75,879,515.01) | | (75,879,515.01) | 0.5723 | | (43,428,684.43) |
| 2012 | | | | | [2] | (77,301,321.30) | | (77,301,321.30) | 0.5440 | | (42,054,010.60) |
| 2013 | | | | | [2] | (79,253,508.85) | | (79,253,508.85) | 0.5171 | | (40,983,342.63) |
| 2014 | | | | | [2] | (79,814,741.55) | | (79,814,741.55) | 0.4915 | | (39,231,992.42) |
| 2015 | | | | | [2] | (79,798,199.30) | | (79,798,199.30) | 0.4672 | | (37,283,675.50) |
| 2016 | | | | | [2] | (78,710,952.31) | | (78,710,952.31) | 0.4441 | | (34,956,598.80) |

**John W. Griffiths v. Aviva London Assignment Corporation et al.**
**Guaranteed Annuities - Actual and Projected Payments**
**2001 to 2016 Actual - 2017 Forward Projected**
Exhibit 1

| Year | Premium Paid for Active Policies | Premium Paid for Active Policies | Total Premium Paid | Payments | Net Cash Flow | PV Factor | PV Net Cash Flow |
|---|---|---|---|---|---|---|---|
| Total | $ 1,199,338,608.00 | $ 102,997,135.00 | $ 1,302,335,743.00 | $ (3,501,239,693.68) | $ (2,198,903,950.68) | | $ 0.00 |
| | | | | | | IRR | 5.2% |

[1]   First Answers to Interrogatories
[2]   Second and Third Answers to Interrogatories
[3]   Copy of STAR Run-Off Estimate

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Modified to Reduce Premiums for Additional 106 Basis Points in IRR - 2017 Forward Projected
Exhibit 1A

| Year | | Total Premium Paid | | Adjusted Total Premium | | Payments | Net Cash Flow | PV Factor | PV Net Cash Flow | PV Factor at 5.2% | PV Payments 5.2% IRR | PV Payments 6.3% IRR | Difference 2001 - 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | [1] | $ 1,299,000.00 | | $ 1,133,729.31 | | $ - | $ 1,133,729.31 | 0.9410 | $ 1,066,860.34 | 0.9506 | $ | $ | $ - |
| 2002 | [1] | 65,476,374.00 | [2] | 57,212,839.32 | | (7,224,197.21) | 49,988,642.11 | 0.8855 | 44,265,740.71 | 0.9036 | (6,527,668.83) | (6,397,141.97) | 130,526.86 |
| 2003 | [1] | 81,118,564.00 | [2] | 70,871,780.99 | | (5,497,734.01) | 65,374,046.98 | 0.8333 | 54,475,341.93 | 0.8589 | (4,722,114.40) | (4,581,190.15) | 140,924.26 |
| 2004 | [1] | 81,085,991.00 | [2] | 70,799,197.99 | | (10,384,459.22) | 60,414,738.77 | 0.7841 | 47,373,524.22 | 0.8165 | (8,478,537.12) | (8,142,854.55) | 335,682.57 |
| 2005 | [1] | 111,987,439.00 | [2] | 97,774,159.34 | | (17,232,274.98) | 80,641,884.36 | 0.7379 | 59,537,290.81 | 0.7761 | (13,483,122.97) | (12,819,178.20) | 663,944.77 |
| 2006 | [1] | 260,734,118.00 | [2] | 227,679,979.26 | | (26,836,513.44) | 200,843,465.82 | 0.6944 | 139,459,111.91 | 0.7377 | (19,798,471.07) | (18,634,394.28) | 1,164,076.79 |
| 2007 | [1] | 311,179,706.00 | [2] | 271,680,010.21 | | (41,778,001.07) | 229,902,009.14 | 0.6534 | 150,220,828.48 | 0.7013 | (29,297,966.49) | (27,298,264.84) | 1,999,701.65 |
| 2008 | [1] | 370,748,582.00 | [2] | 323,646,434.30 | | (59,221,630.07) | 264,424,804.23 | 0.6149 | 162,587,733.02 | 0.6666 | (39,477,936.00) | (36,413,794.87) | 3,064,141.13 |
| 2009 | [1] | 20,044,979.00 | [2] | 17,565,918.59 | | (70,473,395.16) | (52,907,476.57) | 0.5786 | (30,612,643.26) | 0.6337 | (44,656,382.23) | (40,776,409.03) | 3,879,973.20 |
| 2010 | | | [2] | | | (76,121,148.39) | (76,121,148.39) | 0.5445 | (41,446,447.51) | 0.6023 | (45,850,907.24) | (41,446,447.51) | 4,404,459.74 |
| 2011 | | | [2] | | | (75,879,515.01) | (75,879,515.01) | 0.5124 | (38,878,072.44) | 0.5726 | (43,446,161.12) | (38,878,072.44) | 4,566,088.67 |
| 2012 | | | [2] | | | (77,301,321.30) | (77,301,321.30) | 0.4821 | (37,270,506.40) | 0.5443 | (42,072,172.91) | (37,270,506.40) | 4,801,966.51 |
| 2013 | | | [2] | | | (79,253,508.85) | (79,253,508.85) | 0.4537 | (35,957,962.36) | 0.5174 | (41,002,834.62) | (35,957,962.36) | 5,044,872.26 |
| 2014 | | | [2] | | | (79,814,741.55) | (79,814,741.55) | 0.4269 | (34,076,727.71) | 0.4918 | (39,252,087.13) | (34,076,727.71) | |
| 2015 | | | [2] | | | (79,798,199.30) | (79,798,199.30) | 0.4018 | (32,060,187.78) | 0.4675 | (37,301,136.71) | (32,060,187.78) | |
| 2016 | | | [2] | | | (78,710,952.31) | (78,710,952.31) | 0.3781 | (29,758,177.87) | 0.4444 | (34,977,062.24) | (29,758,177.87) | |

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Modified to Reduce Premiums for Additional 106 Basis Points in IRR - 2017 Forward Projected
Exhibit 1A

| Year | Total Premium Paid | Adjusted Total Premium | Payments | Net Cash Flow | PV Factor | PV Net Cash Flow | PV Factor at 5.2% | PV Payments 5.2% IRR | PV Payments 6.3% IRR | Difference 2001 - 2013 |
|------|-------------------|------------------------|----------|---------------|-----------|------------------|-------------------|---------------------|---------------------|------------------------|

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Modified to Reduce Premiums for Additional 106 Basis Points in IRR - 2017 Forward Projected
Exhibit 1A

| Year | Total Premium Paid | Adjusted Total Premium | Payments | Net Cash Flow | PV Factor | PV Net Cash Flow | PV Factor at 5.2% | PV Payments 5.2% IRR | PV Payments 6.3% IRR | Difference 2001 - 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | $ 1,302,335,743.00 | $ 1,137,230,320.00 | $ (3,501,239,603.68) | $ (2,364,009,373.68) | | $ 0.00 | | $ (952,843,190.75) | $ (782,160,155.71) | $ 30,198,358.41 |

IRR 6.3%

[1]  First Answers to Interrogatories
[2]  Second and Third Answers to Interrogatories
[3]  Copy of STAR Run-Off Estimate

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Modified to Reduce Premiums for Additional 50 Basis Points in IRR - 2017 Forward Projected
Exhibit 1B

| Year | Total Premium Paid | | Adjusted Total Premium | Payments | Adjusted Net Cash Flow | PV Factor at 5.7% | PV Net Cash Flow | PV Factor at 5.2% | PV Payments 5.2% IRR | PV Payments 5.7% IRR | Difference 2001 - 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | $ 1,299,000.00 | [1] | $ 1,216,221.34 | $ - | $ 1,216,221.34 | 0.9460 | $ 1,150,593.25 | 0.9506 | $ - | $ - | $ - |
| 2002 | 65,476,374.00 | [1] | 61,337,441.13 | (7,224,197.21) | 54,113,243.92 | 0.8950 | 48,430,837.03 | 0.9036 | (6,527,668.83) | (6,465,587.58) | 62,081.26 |
| 2003 | 81,118,564.00 | [1] | 75,986,287.24 | (5,497,734.01) | 70,488,553.23 | 0.8467 | 59,682,389.88 | 0.8589 | (4,722,114.40) | (4,654,910.47) | 67,203.93 |
| 2004 | 81,045,981.00 | [1] | 75,913,704.24 | (10,384,489.22) | 65,529,215.02 | 0.8010 | 52,489,444.40 | 0.8165 | (8,478,537.12) | (8,318,034.10) | 160,503.02 |
| 2005 | 111,987,439.00 | [2] | 104,868,474.47 | (17,372,778.98) | 87,495,695.49 | 0.7578 | 66,503,769.15 | 0.7741 | (13,483,122.97) | (13,164,828.89) | 318,294.38 |
| 2006 | 260,734,118.00 | [2] | 244,178,386.55 | (26,836,513.44) | 217,341,873.09 | 0.7169 | 155,811,182.19 | 0.7377 | (19,798,471.07) | (19,238,942.50) | 559,528.58 |
| 2007 | 311,179,706.00 | [2] | 291,395,606.89 | (41,778,001.07) | 249,617,605.82 | 0.6782 | 169,293,246.48 | 0.7013 | (29,297,966.49) | (28,334,273.17) | 963,693.32 |
| 2008 | 370,748,582.00 | [2] | 347,156,664.65 | (59,221,630.07) | 287,935,034.58 | 0.6416 | 184,743,060.45 | 0.6666 | (39,477,936.00) | (37,997,408.69) | 1,480,527.31 |
| 2009 | 20,044,979.00 | [1] | 18,803,299.14 | (70,473,395.16) | (51,670,096.02) | 0.6070 | (31,363,324.70) | 0.6337 | (44,656,382.23) | (42,776,773.14) | 1,879,609.09 |
| 2010 | | [2] | | (76,121,148.39) | (76,121,148.39) | 0.5742 | (43,711,666.09) | 0.6023 | (45,850,907.24) | (43,711,666.09) | 2,139,241.15 |
| 2011 | | [2] | | (75,879,515.01) | (75,879,515.01) | 0.5433 | (41,221,688.57) | 0.5726 | (43,446,161.12) | (41,221,688.57) | 2,224,472.55 |
| 2012 | | [3] | | (77,301,321.30) | (77,301,321.30) | 0.5139 | (39,728,059.40) | 0.5443 | (42,072,472.91) | (39,728,059.40) | 2,344,413.51 |
| 2013 | | [2] | | (79,253,508.85) | (79,253,508.85) | 0.4862 | (38,533,471.47) | 0.5174 | (41,002,834.62) | (38,533,471.47) | 2,469,363.15 |
| 2014 | | [3] | | (79,814,741.55) | (79,814,741.55) | 0.4600 | (36,712,330.27) | 0.4918 | (39,252,087.13) | (36,712,330.27) | |
| 2015 | | [2] | | (79,798,199.30) | (79,798,199.30) | 0.4351 | (34,724,110.87) | 0.4675 | (37,304,136.71) | (34,724,110.87) | |
| 2016 | | [2] | | (78,710,952.31) | (78,710,952.31) | 0.4117 | (32,402,790.48) | 0.4444 | (34,977,062.24) | (32,402,790.48) | |

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Modified to Reduce Premiums for Additional 50 Basis Points in IRR - 2017 Forward Projected
Exhibit 1B

| Year | Total Premium Paid | Adjusted Total Premium | Payments | Adjusted Net Cash Flow | PV Factor at 5.7% | PV Net Cash Flow | PV Factor at 5.2% | PV Payments 5.2% IRR | PV Payments 5.7% IRR | Difference 2001 - 2013 |
|------|---|---|---|---|---|---|---|---|---|---|

John W. Griffiths v. Aviva London Assignment Corporation et al.
Guaranteed Annuities - Actual and Projected Payments
2001 to 2016 Modified to Reduce Premiums for Additional 50 Basis Points in IRR - 2017 Forward Projected
Exhibit 1B



| Year | Total Premium Paid | Adjusted Total Premium | Payments | Adjusted Net Cash Flow | PV Factor at 5.7% | PV Net Cash Flow | PV Factor at 5.2% | PV Payments 5.2% IRR | PV Payments 5.7% IRR | Difference 2001 - 2013 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | $ 1,302,335,743.00 | $ 1,219,639,864.30 | $ (3,501,239,693.68) | $ (2,281,599,829.38) | | $ 0.00 | | $ (952,843,190.75) | $ (866,340,529.12) | $ 14,668,926.24 |

IRR  5.7%

[1] First Answers to Interrogatories
[2] Second and Third Answers to Interrogatories
[3] Copy of STAR Run-Off Estimate

John W. Griffiths v. Aviva London Assignment Corporation et al.
Moody's Seasoned Corporate Bond Yield Comparison
Exhibit 2

| Time Period | Measure | Spread Between Aaa and Baa |
|---|---|---|
| **2001** | | |
| | Average | 0.86 |
| | Min | 0.69 |
| | Max | 1.45 |
| **2002** | | |
| | Average | 1.31 |
| | Min | 1.17 |
| | Max | 1.48 |
| **2003** | | |
| | Average | 1.10 |
| | Min | 0.95 |
| | Max | 1.31 |
| **2004** | | |
| | Average | 0.77 |
| | Min | 0.63 |
| | Max | 0.98 |
| **2005** | | |
| | Average | 0.83 |
| | Min | 0.57 |
| | Max | 1.00 |
| **2006** | | |
| | Average | 0.89 |
| | Min | 0.75 |
| | Max | 0.96 |
| **2007** | | |
| | Average | 0.92 |
| | Min | 0.77 |
| | Max | 1.19 |
| **2008** | | |
| | Average | 1.81 |
| | Min | 1.13 |
| | Max | 3.50 |
| **2009** | | |
| | Average | 1.98 |
| | Min | 1.06 |
| | Max | 3.35 |
| **2001 - 2009** | | |
| | Average | 1.16 |
| | Min | 0.57 |
| | Max | 3.50 |

| Date | Measure | Spread Between AAA and BB |
|---|---|---|
| **2001** | | |
| | Average | 3.50 |
| | Min | 2.81 |
| | Max | 4.99 |
| **2002** | | |
| | Average | 4.53 |
| | Min | 2.93 |
| | Max | 6.54 |
| **2003** | | |
| | Average | 3.30 |
| | Min | 1.80 |
| | Max | 5.14 |
| **2004** | | |
| | Average | 1.73 |
| | Min | 1.28 |
| | Max | 2.03 |
| **2005** | | |
| | Average | 1.87 |
| | Min | 1.16 |
| | Max | 2.37 |
| **2006** | | |
| | Average | 1.86 |
| | Min | 1.33 |
| | Max | 2.39 |
| **2007** | | |
| | Average | 1.92 |
| | Min | 1.10 |
| | Max | 3.57 |
| **2008** | | |
| | Average | 4.90 |
| | Min | 2.89 |
| | Max | 10.84 |
| **2009** | | |
| | Average | 6.14 |
| | Min | 3.96 |
| | Max | 9.40 |
| **2001 - 2009** | | |
| | Average | 3.31 |
| | Min | 1.10 |
| | Max | 10.84 |

| Date | Measure | Spread Between AAA and BB |
|------|---------|---------------------------|
| **2001** | | |
| | Average | 3.60 |
| | Min | 2.83 |
| | Max | 5.14 |
| **2002** | | |
| | Average | 4.50 |
| | Min | 2.98 |
| | Max | 6.42 |
| **2003** | | |
| | Average | 3.23 |
| | Min | 1.85 |
| | Max | 4.98 |
| **2004** | | |
| | Average | 1.82 |
| | Min | 1.39 |
| | Max | 2.13 |
| **2005** | | |
| | Average | 1.93 |
| | Min | 1.29 |
| | Max | 2.39 |
| **2006** | | |
| | Average | 1.85 |
| | Min | 1.31 |
| | Max | 2.37 |
| **2007** | | |
| | Average | 1.94 |
| | Min | 1.11 |
| | Max | 3.59 |
| **2008** | | |
| | Average | 4.94 |
| | Min | 2.89 |
| | Max | 10.82 |
| **2009** | | |
| | Average | 5.92 |
| | Min | 3.84 |
| | Max | 9.35 |
| **2001 - 2009** | | |
| | Average | 3.30 |
| | Min | 1.11 |
| | Max | 10.82 |